Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 00 C 740 | DATE | 3/10/2004 |
| CASE TITLE | Willie Morris vs. Chicago Transit Authority | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] **Enter MEMORANDUM, OPINION AND ORDER: We grant the motion of defendant Chicago Transit Authority for summary judgment [26-1]. Judgment is entered in favor of the Chicago Transit Authority on all counts of plaintiff's complaint. This case is hereby terminated. This is a final and appealable order.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | MAR 11 2004 | |
| | Notified counsel by telephone. | date docketed | 31 |
| ✓ | Docketing to mail notices. | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | | |
| TSA courtroom deputy's initials | | 2004 MAR 11 AM 8:20 | date mailed notice |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| WILLIE MORRIS, | ) | |
| Plaintiff, | ) ) ) | **DOCKETED** |
| v. | ) No. 00 C 740 ) | MAR 1 1 2004 |
| CHICAGO TRANSIT AUTHORITY, | ) Wayne R. Andersen ) District Judge | |
| Defendant. | ) ) ) | |

## MEMORANDUM, OPINION AND ORDER

This case is before the Court on the motion of the Defendant Chicago Transit Authority ("CTA") for summary judgment pursuant to Fed.R.Civ.P. 56. For the following reasons, the motion is granted.

## BACKGROUND

Plaintiff Willie Morris is African-American and was hired by the CTA on March 3, 1983 as a bus mechanic. While he was employed at the CTA, Plaintiff was a member of the bus mechanics union, Local 701.

In late 1997, at Plaintiff's request, he was trained to repair transmissions. Experienced mechanic Mike Calkin trained Plaintiff and, in Plaintiff's words, "he trained me very well, you know, he did train me well." Plaintiff repaired transmissions until his discharge on June 8, 1998.

Pursuant to the Collective Bargaining Agreement between Local 701 and the CTA, Local 701 mechanics received vacation time in an amount based upon their seniority. Annually, in the spring, Local 701 employees pick full weeks of vacation in seniority order for the fiscal year June 1 to May 31. Such selection system allowed the company to control the number of vacationing

employees during any one week.

In addition to vacations in full week increments, employees had ten additional vacation days that they could use randomly depending upon manpower availability. Local 701 mechanics also had four "floating" holidays per year that they could use depending upon manpower availability. Thus, on any given day, before the work day begins, an employee could request to use a "random vacation day" or a floating holiday. If there were not too many employees off on that particular day, they would be granted the day off. The Foreman makes the decision to grant requests for random vacation days and floating holidays.

On July 1, 2, 3, 5 and 15, 1996 Plaintiff was absent from work. On July 1, 2, 5 and 15, 1996, plaintiff called his work location each day after the work day began and requested a random vacation day for the reasons of out-of-town company, spouse's illness and vehicle emissions problems. Each request was denied because of manpower availability. Thus, Plaintiff was charged with unexcused absences on July 1, 2, 5 and 15, 1996. Furthermore, on July 3, 1996, Plaintiff was AWOL because he was scheduled to work, he did not come to work, and he did not call the work location to advise them that he would not be coming to work.

The CTA has various written rules that employees must follow, including rules in its General Rule Book. The CTA uses a progressive discipline system whereby successive similar violations over a fixed time period result in progressively more severe discipline. Under the CTA's Corrective Action Guidelines in effect in 1996, an employee who is AWOL could be issued a Final Written Warning and a Corrective Case Interview or Discharge for the first incident within a twelve-month period. For the second incident within a twelve-month period, an employee who was not discharged would be referred to the General Manager with a

2

Recommendation for Discharge. Under the Corrective Action Guidelines, employees who miss work are subject to the following progressive discipline over any twelve-month period: (1) first incident; written warning; (2) second incident; written warning; (3) third incident; final written warning and corrective case interview; (4) forth incident; corrective case interview or discharge; and (5) fifth incident; referral to the General Manager with a Recommendation for Discharge.

On July 16, 1996, when Plaintiff returned to work after his unexcused absence on July 15, 1996, he was removed from service and referred to his Manager, Michael O'Connor. On July 18, 1996 Manager O'Connor interviewed Plaintiff and found that said absences violated certain CTA rules. Mr. O'Connor prepared a Record of Interview, a Recommendation for Discharge to General Manager Dennis Milicevic and a memorandum to file.

The recommendation along with supporting documentation was sent to a section of CTA's personnel department called Human Resources, Program Compliance, which reviewed the recommendation for conformance with CTA rules and union rules and for uniformity with prior recommendations for discharge. Human Resources, Program Compliance approved of the recommendation for discharge as to conformity with rules and uniformity. Human Resources, Program Compliance, issued a written, unsigned Notice of Discharge for Plaintiff and sent it back to the General Manager, Dennis Milicevic. Mr. Milicevic was required to interview Plaintiff before deciding on whether to implement the discharge, issue some other discipline, or not issue any discipline at all.

On August 2, 1996, Dennis Milicevic interviewed Plaintiff with regard to the recommendation that he be discharged because of his attendance problems. Mr. Milicevic reviewed Plaintiff's prior twelve-month work record which showed that from September 19-25,

1995, he was AWOL and on March 19, 1996, he was charged with a failure to report for duty. At the interview, Plaintiff was represented by Local 701, business agent Boysen Andersen. Mr. Milicevic felt that Plaintiff's thirteen years of service to the CTA mitigated against discharging Plaintiff. Thus, the parties agreed to a one-year probation during which any incident of AWOL or unexcused absence by Plaintiff would result in his immediate discharge. Also, Plaintiff agreed to enroll in the Employee Assistance Program (for counseling to handle personal problems which gave rise to the absences), and he was advised of his Family Medical Leave Act (FMLA) rights as to his sick spouse.

On July 15, 16 and 18, 1997, Plaintiff called the shop and was granted permission to have a random vacation day on each day. On July 21, 22 and 23 1997, Plaintiff was scheduled to work, did not call to request time off and thus was AWOL. On July 24, 1997, Plaintiff called at 9:30 a.m., spoke to his foreman Joe Garner, did not come to work or request the time off and thus incurred an unexcused absence.

On July 25, 1997, Plaintiff returned to work and was interviewed by his Manager, Stephanie Martin in the presence of Union Steward, Harvey Syzmanski. Ms. Martin is African-American, and during the relevant time period, she had supervisory responsibility over foreman Joe Garner and his subordinates, including Plaintiff.

On or before the July 25, 1997, interview with Plaintiff, Ms. Martin reviewed Plaintiff's work record and saw that Plaintiff was in violation of his August 2, 1996 probation. At the interview, Plaintiff was given an opportunity to explain his absences and asked to explain why he should not be charged with AWOL for July 21, 22 and 23, 1997 and an unexcused absence on July 24, 1997. Plaintiff failed to provide a valid excuse for his absences. Ms. Martin found

4

Plaintiff to be in violation of his probation and prepared a Recommendation for Discharge to the General Manager.

The Recommendation for Discharge was sent to the CTA's Human Resources Program Compliance which approved of the recommendation. Human Resources Program Compliance prepared an unsigned Notice of Discharge and sent it to General Manager Milicevic.

A discharge interview was scheduled for August 11, 1997. At that time, an interview took place with Plaintiff, General Manager Dennis Milicevic, Union Steward Major Warren and Manager Martin. Plaintiff asked to continue the interview to obtain representation from Local 701 Business Agent, Boysen Andersen.

On August 25, 1997, General Manager Dennis Milicevic met with Plaintiff and his Local 701 Business Agent, Boysen Andersen. Plaintiff and Mr. Andersen asked for leniency and one last chance. Mr. Milicevic decided to give Plaintiff one last chance and, in lieu of discharge, placed Plaintiff on his second and final twelve-month probation which was to run from August 27, 1997, to August 25, 1998, during which Plaintiff could not incur any AWOL, unexcused absence or attendance violation or else be subject to immediate discharge.

General Manager Milicevic has held a position at the CTA with authority to discharge since 1982. In that time he has received over 100 recommendations for discharge. Approximately half of the employees referred for discharge were placed on a six-month or a one-year probation, and the other half were discharged. Of those placed on probation, approximately three-quarters successfully completed the probation and the other quarter were discharged for violating their probation. A second probation instead of a discharge was afforded to only two employees, Plaintiff and another employee whose race was white.

In late 1997, Plaintiff was finishing his training on transmissions. At the CTA, mechanics are given a certain amount of hours to complete the repairs on a transmission. On January 23, 1998, Plaintiff was taking too long to finish his transmissions and he was cited for violating the CTA's General Rule against poor work performance. Manager Martin interviewed Plaintiff, found him to be in violation of said CTA rule, and imposed a discipline of "noted," the lowest level of discipline.

On February 13, 1998, Plaintiff's work production had not improved as he took ninety-four hours to do a fifty-hour job. Plaintiff was again interviewed by Manager Martin for his poor work performance and given the discipline of a second noted. Plaintiff requested to meet with General Manager Dennis Milicevic and an appointment was scheduled for February 17, 1998.

On February 13, 1998, Plaintiff wrote a four-page letter in which he made general accusations of unfair treatment and delivered it to Manager Martin. Ms. Martin passed the written response on to General Manager Milicevic. On February 16, 1998, Mr. Milicevic sent a memo to Ms. Martin asking her to investigate the accusations in Plaintiff's letter. On February 18, 1998, Ms. Martin responded to Plaintiff's accusations in a memo to Mr. Milicevic, noting that there was no basis for the accusations.

On February 20, 1998, Plaintiff was cited for leaving his assigned work location without permission. Plaintiff was interviewed by Ms. Martin and given the discipline of a noted. On April 2, 1998, Plaintiff was cited for exchanging his work assignment without authorization. Plaintiff was interviewed by Ms. Martin and, again, was given the discipline of a noted.

On Thursday, May 7, 1998, at approximately 8:10 a.m., Plaintiff called his Foreman Joe Garner to request the day off because of basement flooding. Mr. Garner reviewed Plaintiff's work

record, saw that Plaintiff had used all of his ten random vacation days and all of his four floating holidays and, thus, all he could have was an unauthorized day off. Mr. Garner was also aware that Plaintiff was on probation for his attendance and that the probation had been granted by the General Manager. Mr. Garner felt that his authority only extended to allowing excused vacations based upon an employee's available vacation and holiday time. If an employee is on probation from the General Manager, Mr. Garner felt he could not grant any exceptions to the excused vacation rules, but could inform the employee that they can ask for such exception from the Manager or General Manager. Foreman Garner then refused Plaintiff's request.

Plaintiff then spoke to Manager Martin and asked for an "R.D.O." (requested day off) because he had water in his basement. Manager Martin told Plaintiff that the foreman makes that call. Plaintiff admitted that the foreman had refused the R.D.O., and Manager Martin said that she would support the Foreman.

On May 8, 1998, at approximately 9:15 a.m., Plaintiff called Foreman Garner, asked how his time was being carried. Mr. Garner told him he was being carried as "unauthorized time off." Plaintiff said he was taking off for flood damage and needed to be carried as an R.D.O. Mr. Garner told Plaintiff he would not grant an R.D.O., and Plaintiff asked to speak to Manager Martin.

At approximately 9:20 a.m. on Friday, May 8, 1998, Plaintiff spoke with Manager Martin. Plaintiff stated he wanted an R.D.O. because he still had water in his basement. Ms. Martin told Plaintiff again that the Foreman makes the call.

On Monday, May 11, 1998, at approximately 7:25 a.m., Plaintiff called Foreman Garner to report that he would not be at work because of continued problems in his basement. Plaintiff

7

asked how his time was being carried, and Mr. Garner told him he was being carried as "unauthorized time off." Plaintiff said he would be at work on Tuesday.

On Tuesday, May 12, 1998, at approximately 7:20 a.m., Plaintiff called Mr. Garner and stated that he would not be coming to work, that he had a disaster on hand and that he was unsure of his status for the next day. Thereafter, Mr. Garner called Ms. Martin and reported Plaintiff's phone call to her.

On Wednesday, May 13, 1998, at approximately 8:20 a.m., Ms. Martin called Mr. Garner and asked if Plaintiff had reported to work. Mr. Garner replied he had not reported to work, and he had not called in. Ms. Martin told Mr. Garner that if Plaintiff does not call, to carry him as AWOL.

At approximately 10:30 a.m., Plaintiff called to ask if his paycheck was ready. Plaintiff came to the General Manager's office just before lunch and picked up his paycheck. Plaintiff did not meet with Ms. Martin while he was on CTA premises.

On Thursday, May 14, 1998 and Friday, May 15, 1998 at approximately 8:30 a.m., on each day, Ms. Martin had a telephone conversation with Mr. Garner. On each day, Mr. Garner told Ms. Martin that Plaintiff had not come to work. Ms. Martin told Mr. Garner to carry Plaintiff as AWOL.

On Friday May 15, 1998, at approximately 1:50 p.m., Plaintiff called Mr. Garner and asked to speak to union steward Major Warren. Mr. Garner told Plaintiff that Mr. Warren was on vacation for three weeks. Plaintiff again stated that he had told Manager Martin that he had a disaster in his basement, that he would be to work on Monday and that he would have documentation.

8

On Monday May 18, 1998 at approximately 7:30 a.m., Plaintiff entered the office area. Ms. Martin told Plaintiff that he was in violation of his probation and that he needed union representation. Ms. Martin called Union Steward Harvey Szymanski. When Mr. Szymanski arrived, Ms. Martin stated that Plaintiff was being removed from service because he was in violation of his probation and that he was being referred to the General Manager with a Recommendation for Discharge. The matter was referred to the General Manager, Dennis Milicevic and an interview was scheduled for May 26, 1998.

On May 18, 1998, Ms. Martin prepared a written Recommendation for Discharge. The Recommendation was sent with attachments to CTA's Human Resources, Program Compliance which approved of the recommendation as to conformity with CTA rules and uniformity with other CTA disciplinary matters. Human Resources, Program Compliance prepared a Notice of Discharge and sent it to Mr. Milicevic.

On May 26, 1998, the interview with General Manager Dennis Milicevic was continued to June 8, 1998. On June 8, 1998, an interview was conducted by General Manager Dennis Milicevic concerning the Recommendation to Discharge Plaintiff. In attendance were Mr. Milicevic, Manager Stephanie Martin, Manager John Kurtovich, Plaintiff, Local 701 Business Agent Boysen Andersen and Union Steward Harvey Szymanski.

At the interview, Mr. Milicevic explained why Plaintiff was being recommended for discharge and gave Plaintiff an opportunity to make a statement. Mr. Milicevic reviewed Plaintiff's work record and considered his years at the CTA. Mr. Milicevic decided to discharge Plaintiff because he had given Plaintiff two probations in lieu of discharge, both of which Plaintiff had violated. Plaintiff acknowledged that he was aware in May, 1998, that he was on

9

probation and that any unexcused absence was a ground for dismissal. Plaintiff admitted that all of the absences from May 7 to May 15 were unexcused. Plaintiff then was discharged from employment with the CTA.

Plaintiff filed an EEOC Charge of Discrimination on June 17, 1998, making claims that he was discharged because of his race, age, disability and in retaliation. Plaintiff then filed suit in this Court alleging that he was discharged because of his race, age, disability, and retaliation.

## DISCUSSION

Summary judgment will be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court will not render summary judgment if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The mere possibility of a factual dispute is not enough to defeat a summary judgment motion. *Id.* at 250; *Waidridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

I. Legal Standards

Plaintiff may attempt to prove his claim of discrimination in two ways. He can rely on direct evidence or, in the absence of such evidence, he can rely on the indirect method outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Cheek v. Peabody Coal Co.*, 97 F.3d 200, 203 (7th Cir. 1996).

Under the first method, Plaintiff must initially prove through direct evidence that the CTA's employment actions were based on impermissible factors. *McCarthy v. Kemper Life Ins.*

10

*Cos.*, 924 F.2d 683, 686 (7" Cir. 1991). To qualify as direct evidence, the "evidence must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question." *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 569 (7th Cir. 1989). In this case, there is no such direct evidence. Therefore, Plaintiff cannot prove through direct evidence that the CTA intentionally discriminated against him.

In the absence of direct evidence of discrimination, Plaintiff may attempt to meet his burden of proving intentional discrimination by first establishing a prima facie case that: (1) he was a within a protected class; (2) his performance met the CTA's legitimate expectations; (3) he suffered an adverse employment action; and (4) the CTA treated similarly situated employees not in the protected class more favorably. E.E.O.C. v. *Our Lady of Resurrection Medical Center*, 77 F.3d 145, 148-49 (7" Cir. 1996); *Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir. 1994). Establishment of a prima facie case merely raises an inference of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 528 (1993); *Hughes*, 20 F.3d at 746.

If a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged personnel action. *Hughes*, 20 F.3d at 746; *McDonnell Douglas Corp.*, 411 U.S. at 802. Once the employer states such a reason, the burden returns to plaintiff to establish that defendant's legitimate non-discriminatory reasons are a mere pretext for discrimination. Plaintiff must establish by a preponderance of the evidence that: (1) the non-discriminatory reasons proffered by the employer are false; and (2) discrimination was the real reason for the employment action. *St. Mary's Honor Ctr.*, 509 U.S. at 528.

11

## II. Race Discrimination

### A. Plaintiff's Prima Facie Case

In this case, the uncontested evidence shows that Plaintiff cannot establish the second and fourth prima facie elements--that he was meeting the CTA's legitimate expectations and that the CTA treated similarly situated employees who are not African-American more favorably.

#### 1. Plaintiff Was Not Meeting The CTA's Legitimate Performance Expectations

Plaintiff was not meeting the CTA's legitimate performance expectations. His attendance and work quality were poor. Plaintiff was considered for discharge in August, 1996, because his attendance record was so poor. In August 2, 1996, in lieu of discharge, General Manager Dennis Milicevic agreed to place Plaintiff on a twelve-month probation during which Plaintiff could not incur any incident of AWOL or unexcused absence without being subject to immediate discharge. On July 21, 22, 23 and 24, 1997, Plaintiff breached the probation agreement, which could have subjected him to immediate discharge.

A discharge interview was continued to August 25, 1997, at Plaintiff's request so the union representative of Plaintiff's choice could attend. At the interview with General Manager Dennis Milicevic, Plaintiff and his representative asked for leniency and a second chance. General Manager Milicevic gave Plaintiff a second twelve-month probation that was to run from August 27, 1997 to August 25, 1998, during which Plaintiff could not incur any AWOL or unexcused absence.

At that time under the Collective Bargaining Agreement between the CTA and Plaintiff's union, Plaintiff was entitled to two to five full weeks of vacation in an amount which increased depending upon seniority at the CTA. Additionally, Plaintiff had ten random days and four

12

floating holidays or a total of 14 days to be used randomly as needed during the year.

Notwithstanding the availability of all of this vacation time for the year, Plaintiff breached the second probation agreement when he missed seven consecutive work days from May 7, 1998 to May 15, 1998. Plaintiff had used up all of his annual 14 days by May 7, 1998. Plaintiff knew in May, 1998, that he was on probation and that an unexcused absence was a ground for dismissal. Plaintiff acknowledged that his absences from May 7 to May 15, 1998, were unexcused. As a result, on June 8, 1998, Plaintiff was discharged for violating his second probation agreement.

Furthermore, the undisputed evidence shows that Plaintiff's work performance was not meeting the CTA's legitimate expectations when he was at work. Plaintiff was trained by an experienced mechanic and Plaintiff admits that he was trained well. Notwithstanding, on January 23, 1998, plaintiff was cited for poor work performance when he took too long to do transmission repairs. On February 13, 1998, Plaintiff was again cited for poor work performance when he needed ninety-four hours to do a fifty hour transmission repair. On February 20, 1998, plaintiff was cited for leaving his assigned work location without permission. On April 2, 1998, plaintiff was cited for exchanging his work assignment without authorization.

In summary, Plaintiff's work record was inadequate both as to his attendance and his work performance. Plaintiff was not meeting the CTA's legitimate expectations and, as such, Plaintiff cannot establish a prima facie case of discrimination.

### 2. Similarly Situated Employees Were Not Treated More Favorably

Another element of Plaintiff's prima facie case which Plaintiff cannot prove is that the CTA treated similarly situated employees who are not African-American more favorably. In this

case, there is no evidence of any employee violating two probations and not being discharged. There is no evidence that any employee was treated differently than Plaintiff.

Plaintiff claims that his absences from May 7 to May 15, 1998, were of an emergency nature because he had basement flooding. In his Complaint, Plaintiff alleges that white employees received emergency time off in May, 1998, for basement flooding. In his Answers to Interrogatories, Plaintiff identified ten white employees by name. However, nine of the ten state in their affidavits submitted in support of this motion for summary judgment that they have never missed time from work for basement flooding. The tenth person states that he left work early once in 1986 or 1987. Thus, there is no credible evidence that the CTA treated similarly situated employees who are not African-American more favorably than Plaintiff.

B. The CTA Had A Legitimate Non-Discriminatory Reason For Its Actions

As explained above, Plaintiff was discharged for violating his second probationary agreement. The record is littered with numerous legitimate reasons for discharging Plaintiff over a two year period of time.

Plaintiff cannot refute the CTA's legitimate, non-discriminatory business reasons for its decision to discharge Plaintiff from employment. See *Lacy v. Ameritech Mobile Commun.*, 965 F. Supp. 1056, 1067 (N.D.Ill. 1997), *aff'd*, 142 F.3d 440 (7th Cir. 1998), *cert. denied*, 526 U.S. 1025 (1999). Certainly, the rationale behind the CTA's decision to discharge an employee who fails to come to work is legitimate. It is a fundamental rule in the workplace that if an employee is scheduled to work, the employee should come to work. At some point, an employer must be permitted to discharge an employee who does not come to work when they are so scheduled. In this case, Plaintiff failed to come to work so often that he was placed on

probation in lieu of discharge twice and finally, after the third year of excessive days of failing to come to work, Plaintiff was discharged. Plaintiff was given numerous "last" chances.

The CTA has established a legitimate non-discriminatory reason for its decision to discharge Plaintiff. Plaintiff must show that the CTA's proffered reason is pre-textual, i.e., that the proffered reason is an outright lie. *Id.* at 1067-68. In this case, Plaintiff has made no such showing.

General Manager, Dennis Milicevic was the ultimate decision maker in Plaintiff's discharge. Mr. Milicevic had the opportunity to discharge Plaintiff on August 2, 1996. Instead of discharging Plaintiff at that time, Mr. Milicevic placed Plaintiff on a one-year probation. On August 25, 1997, Mr. Milicevic had a second opportunity to discharge Plaintiff. Again, instead of discharging Plaintiff, Mr. Milicevic gave Plaintiff a second chance. Not until the third referral for discharge did Mr. Milicevic implement the discharge. Thus, the undisputed evidence shows that the CTA had a legitimate non-discriminatory reason for its discharge of Plaintiff.

III. Age Discrimination

The *McDonnell Douglas* burden shifting method for analyzing a claim of discrimination based on indirect evidence is the same for age as it is for race. *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1011-12 (7th Cir. 2000). As such, Plaintiff cannot establish two elements of his prima facie case for age discrimination: (1) that his performance on the job met the CTA's legitimate expectations; and (2) that the CTA treated similarly situated employees not in the protected class more favorably. As mentioned above, the CTA clearly had a legitimate non-discriminatory basis for discharging Plaintiff. Moreover, Plaintiff has absolutely no evidence to show that younger employees were treated more favorably.

15

For these reasons, in addition to the reasons addressed in the race discrimination analysis, Plaintiff's claim for age discrimination fails, and summary judgment is granted in favor of the CTA.

IV. Retaliation Charges

A retaliation claim under Title VII based upon indirect evidence utilizes the *McDonnell-Douglas* burden shifting analysis. *Paluck*, 221 F.3d. at 1009. Plaintiff must establish a prima facie case by showing three elements: (1) Plaintiff engaged in statutorily protected expression by complaining of discriminatory activity protected under Title VII; (2) Plaintiff suffered an adverse employment action; and (3) a causal link between the protected expression and the adverse employment action. *Id.* The burden then shifts to the employer to show that it had a legitimate non-discriminatory reason for its actions. Plaintiff can succeed only by showing that the proffered legitimate non-discriminatory reason was a mere pretext for discrimination. *Id.*

In this case, although it is unclear from the Complaint, it appears that Plaintiff's alleged protected expression was his February 13, 1998 four-page grievance letter to Manager Stephanie Martin. However, there is no evidence that his discharge was related to the letter. See *McLaughlin v. CTA*, 01 C 4606, J. Bucklo, (N.D. Ill., April 24, 2003).

Similarly herein, the 1996 and 1997 probations and the January 23, 1998, and February 13, 1998, write-ups for poor work performance all occurred before Plaintiff's protected expression. As in *McLaughlin,* there is no nexus between the protected expression and the discharge. Thus, Plaintiff cannot prove a causal link between the alleged protected expression and the adverse employment action.

In any event, as argued above, the CTA had a legitimate non-discriminatory reason for

16

discharging Plaintiff. Moreover, there exists no evidence of pretext for the reasons stated above. Therefore, summary judgment is granted in favor of the CTA on Plaintiff's retaliation claim.

V. <u>Disability Discrimination</u>

There are two types of disability discrimination claims under the Americans with Disability Act ("ADA"): (1) failure to accommodate; and (2) disparate treatment. *Basith v. Cook Co.*, 241 F.3d 919, 927 (7th Cir. 2001). The Complaint does not clearly articulate Plaintiff's disability claim.

Paragraph 9(c) of the Complaint states, "The defendant discriminated against the plaintiff because of plaintiff's ... (c) Disability (Americans with Disabilities Act) Suffered from extreme emotional stress and depression." Paragraphs 12(e) and (f) state: "The defendant... (e) failed to reasonably accommodate the plaintiff's disabilities (stress) [and] (f) other (specify) extreme emotional stress and depression due to fiancee's cancer ailment since 1993 and loss of fiancee in fatal car accident on 8-8-96 after a long severe battle with breast cancer."

The Court presumes Plaintiff is trying to assert a claim for a failure to accommodate because the mention of a failure to accommodate in paragraph 12(e). The elements of a claim for a failure to make a reasonable accommodation are: (1) Plaintiff was disabled; (2) the CTA was aware of Plaintiff's disability; and (3) Plaintiff was a qualified individual who, with or without accommodation, could perform the essential functions of the job. *Basith*, 241 F.3d at 927.

In this case, there is no evidence that Plaintiff ever was disabled. Moreover, Plaintiff has failed to prove that the CTA was aware that Plaintiff suffered from a disability. Additionally, there is absolutely no evidence that Plaintiff ever requested an accommodation. Finally, there is no showing of how stress caused Plaintiff to have unexcused absences when Plaintiff alleges that

he missed work to tend to basement flooding in his house.

In *Clay v. City of Chicago*, 143 F.3d 1092, 1094 (7th Cir 1998), plaintiff was discharged for poor work performance rather than taking medical leave and, thus, his discharge did not violate the ADA. Likewise, in the case at bar, there is no evidence that Plaintiff was discharged because of anything related to the alleged disability of stress. Plaintiff was discharged for violating a probationary agreement. As such, judgment is granted in the CTA's favor on Plaintiff's claim that the CTA discharged Plaintiff because of his disability.

## CONCLUSION

The undisputed evidence shows that Plaintiff was a long-term CTA employee who was given every chance to keep his job. Twice he was placed on last-chance probation agreements. Both times he violated the agreements. Plaintiff asked to change jobs to transmission repairs. His request was granted, and he was properly trained. Unfortunately, he could not do the job in the allotted time. There is simply no evidence to support Plaintiff's claims that the discharge was based on race, age, disability or retaliation.

For the foregoing reasons, we grant the motion of Defendant Chicago Transit Authority for summary judgment (# 26-1). Judgment is entered in favor of the Chicago Transit Authority on all counts of Plaintiff's complaint. This case is hereby terminated. This is a final and appealable order.

It is so ordered.

Wayne R. Andersen
United States District Judge

Dated: March 10, 2004